NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

MARTA C., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.O., *Appellees.*

No. 1 CA-JV 14-0069
FILED 09-25-2014

---

Appeal from the Superior Court in Maricopa County
No. JD19397 and JS17269
The Honorable Susanna C. Pineda, Judge

**AFFIRMED**

---

COUNSEL

John L. Popilek, PC, Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Michael Valenzuela
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Kent E. Cattani delivered the decision of the Court, in which Presiding Judge Jon W. Thompson and Judge Donn Kessler joined.

---

**C A T T A N I**, Judge:

¶1        Marta C. ("Mother") appeals from the superior court's ruling terminating her parental rights to her son J.O.  Mother argues the court erred by finding severance warranted on the statutory ground of neglect and because the Department of Child Safety ("DCS")[1] failed to offer her appropriate reunification services.  For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        J.O., born in December 1998, is Mother's biological son.  In December 1999, social services in Colorado removed J.O. from Mother's care and placed him with a foster family. J.O. was returned to Mother a few months later, but they both maintained a relationship with the foster family. When J.O. was approximately five years old, with Mother's consent, he began to visit the foster family yearly during the holidays and over summer vacation; he continued to have contact with the foster family throughout the year through frequent phone calls.

¶3        J.O. was diagnosed with Type 1 Diabetes in 2010.  In mid-July that year, both J.O. and Mother, who is also diabetic, were hospitalized for diabetic ketoacidosis resulting from uncontrolled diabetes.  Based on concerns regarding J.O.'s health, DCS initiated dependency proceedings regarding J.O.

¶4        Approximately 10 days later, Mother and J.O. attended an appointment with Dr. Tala Dajani, a pediatric endocrinologist, who treated

---

[1]        Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), DCS has replaced the Arizona Department of Economic Security ("ADES") in this matter.  For consistency, we refer to DCS in this decision even where, at the time, actions were taken by ADES.

J.O. following his hospitalization. J.O.'s hemoglobin A1c level was 13.3%.[2] Dr. Dajani explained that levels over 10% risked fatal diabetic ketoacidosis and that patients should maintain levels under 8%. Dr. Dajani's office provided Mother and J.O. with education about managing diabetes. Mother and J.O. attended a follow-up visit one week later, at which they were again provided diabetes education.

¶5        One week later, in early August 2010, J.O. was again hospitalized for uncontrolled diabetes, with his blood sugar measuring over 500. Blood sugar measuring above 250 are classified as uncontrolled, and levels over 400 can be associated with changed mental function. Hospital records reflect that Mother did not know J.O.'s correct insulin dosage. DCS removed J.O. from Mother's care and placed him in a group home.

¶6        While living in the group home, J.O.'s hemoglobin A1c levels dropped from 12% three weeks after his hospitalization, to 9.7% two weeks later,[3] to 7.7% by mid-October 2010. J.O. consistently attended appointments with Dr. Dajani as directed during this time.

¶7        At the end of October 2010, DCS transitioned J.O. to an in-home dependency with Mother. In November, J.O.'s hemoglobin A1c level dipped to 6.2%, a pre-diabetes level. When J.O. visited the foster family over the holidays, the family sent the doctor weekly reports of J.O.'s blood sugar measurements, which remained in the safe range. J.O.'s hemoglobin A1c level was still at 6.6% at his next appointment in early February 2011.

¶8        Three months later, Mother failed to return J.O. for a follow-up appointment as recommended by Dr. Dajani. When Dr. Dajani next saw J.O. five months later in late June, J.O.'s hemoglobin A1c level had spiked to 10.2%. The level dropped to 9.3% two weeks later, but crept back to 10% after Mother waited eight weeks, rather than two weeks as advised, to bring J.O. in for follow-up care.

¶9        DCS dismissed the ongoing dependency in mid-October 2011, and J.O. remained in Mother's care. By mid-November, J.O.'s hemoglobin A1c level had reached 13% again, potentially putting J.O.'s life at risk. His

---

[2]      At the hearing, Dr. Dajani testified that J.O.'s hemoglobin A1c level was 12%. J.O.'s medical records, however, show 13.3%.

[3]      Dr. Dajani testified that J.O.'s hemoglobin A1c level was at this point 13.3%, but J.O.'s medical records instead reflect 9.7%.

A1c level remained at 12.3% in early December, but dropped to 8% in February 2012, after he returned from visiting the foster family over the holidays. J.O.'s hemoglobin A1c level remained mostly steady over the next several months, reaching only 8.8% by late June. Dr. Dajani noted that this level was rising, but was not yet dangerous. After the June appointment, however, Mother waited nine months before bringing J.O. in for a follow-up visit.

¶10          J.O. lived with the foster family from January 2013 through mid-August 2013 while Mother was in a rehabilitation center for a broken foot. Both Mother and foster mother accompanied J.O. to an appointment with Dr. Dajani in late March, at which J.O.'s diabetes was under control with a hemoglobin A1c level of just 6.8%.

¶11          J.O. returned to live with Mother in mid-August 2013. At a home visit that month, the DCS case manager found Mother's home to be dirty, with no appropriate food for J.O. Later in August, Mother returned to the hospital with a broken leg. While Mother was hospitalized, J.O. reported that he had been living at the hospital "in order to eat" and that he had not tested his blood sugar or taken his insulin since Mother had been admitted. When tested, his blood sugar measurement was over 240. When Mother returned to the hospital with an infection one week later, her blood sugar measurement was over 500.

¶12          In September 2013, J.O. told Dr. Dajani he thought Mother was selling his diabetes supplies. Shortly thereafter, DCS again initiated dependency and severance proceedings and placed J.O. temporarily with his maternal grandfather.

¶13          At the severance hearing, Dr. Dajani testified about her treatment of J.O.'s diabetes and about the pattern of uncontrolled and unmanaged diabetes with blood sugar spikes while J.O. was in Mother's care. Dr. Dajani stated that her office made education on diabetes management—with a particular emphasis on the parent's role and responsibility to manage the child's diabetes care—available every visit. Dr. Dajani noted that J.O.'s condition deteriorated while in Mother's care notwithstanding Mother's awareness of the disease and the importance of treating it.

¶14          Dr. Dajani also noted several lengthy gaps between appointments, which she described as particularly troubling given J.O.'s previous diabetes-related hospitalizations and periodic spikes in blood sugar measurements. She noted that the foster family maintained

consistent communication with the doctor's office when J.O. was with them and they reported J.O.'s blood sugar measurements weekly. Mother did not stay in contact with the doctor's office between visits. Because of J.O.'s medical history and pattern of high blood sugar measurements when in Mother's care, Dr. Dajani wrote a letter of concern to DCS indicating her opinion that J.O. should not be returned to Mother's care. Dr. Dajani concluded that J.O.'s life, health, and welfare would be at risk because of Mother's inability to provide proper medical care to manage J.O.'s diabetes.

¶15 The case manager informed the superior court that J.O., who was 15 years old at the time, had requested that Mother's parental rights be terminated, indicating that he "want[ed] someone that can help him monitor his diabetes, and . . . that he can't do it with Mom." The case manager noted that DCS had not provided Mother with educational services during the current dependency (although Mother had received medical assistance during the 2010–11 dependency) because of the diabetes education already provided by Dr. Dajani and because Mother had indicated that she knew the appropriate procedures for monitoring and maintaining diabetes.

¶16 Mother testified that she was following through with J.O.'s doctor's appointments, that J.O.'s blood sugar measurements were consistently going down, and that, as a diabetic herself, she knew how to monitor and manage J.O.'s diabetes. She stated that J.O.'s hemoglobin A1c levels had only been above 10% once, just after J.O. was diagnosed with diabetes, and that the medical records to the contrary were incorrect.

¶17 Mother expressed her belief that J.O. had made up the accusation about selling his diabetes supplies because he was angry at her for making him return from the foster family and for, on one occasion, calling the police to make him take his insulin. She suggested J.O. only wanted her rights severed because the foster family was comparatively wealthier and there "[h]e's able to get what he wants." Both the doctor and the case manager, however, expressed their view that it seemed unlikely J.O. was lying about Mother selling his diabetes supplies.

¶18 After the hearing, the superior court issued a detailed ruling finding J.O. dependent as to Mother and severing Mother's parental rights on the ground of neglect. The court found that Mother was aware of J.O.'s medical needs (clean home, appropriate food, and medical appointments every three months), had been provided education on managing his diabetes (monitoring blood sugar measurements, choosing appropriate foods, and providing proper medication), and had been advised that, if not

properly managed, J.O.'s diabetes could be fatal. The court noted that Mother did not consistently take J.O. to medical appointments, and found that J.O.'s blood sugar measurements, although under control while J.O. stayed with the foster family, rose while J.O. lived with Mother, including twice to potentially fatal levels. The court further found that, most recently, Mother had failed to provide for J.O.'s food or housing while she was hospitalized in August 2013, again leading to a spike in his blood sugar measurement well above normal. The court noted Mother's own blood sugar measurement was at least 500, making it "clear that Mother also has difficulty controlling her own diabetes."

**¶19** Mother timely appealed the dependency and severance rulings, but later restricted her appeal to the severance ruling. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") section 8-235.[4]

## DISCUSSION

**¶20** Mother argues the superior court erred by finding severance was warranted due to neglect.[5] The statutory ground of neglect permits severance if "the parent has neglected . . . a child." A.R.S. § 8-533(B)(2). As relevant here, neglect is defined as "[t]he inability or unwillingness of a parent . . . to provide [her] child with . . . medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare." A.R.S. § 8-201(24)(a).

**¶21** The superior court may terminate the parent–child relationship if clear and convincing evidence establishes a statutory ground for severance and if a preponderance of the evidence shows severance to be in the child's best interests. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22, 110 P.3d 1013, 1018 (2005). We review the superior court's severance ruling for an abuse of discretion, accepting the court's factual findings unless clearly erroneous and viewing the evidence in the light most favorable to sustaining the court's findings. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004); *Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2, 181 P.3d 1126, 1128 (App. 2008). We similarly defer to the superior court's credibility judgments.

---

[4] Absent material revisions after the relevant date, we cite a statute's current version.

[5] Mother's argument focuses only on the statutory ground for severance; she does not contest the superior court's best interests finding.

*Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4, 53 P.3d 203, 205 (App. 2002).

**¶22**		Mother claims the evidence showed that she capably managed J.O.'s diabetes and that any problems with managing his diabetes "emanated less from Mother than from J.O. himself." Reasonable evidence, however, supports the superior court's findings. Contrary to Mother's assertion that she was willing and able to monitor and manage J.O.'s diabetes, the record shows a pattern in which J.O.'s blood sugar measurements would spike to dangerous levels while he lived with Mother, would return to lower, controlled levels when he lived away from Mother, then would spike again when he was returned to Mother's care.

**¶23**		Soon after Dr. Dajani began treating J.O., his blood sugar measurement reached a potentially fatal level while he was in Mother's care. J.O.'s hemoglobin A1c levels decreased progressively to safe levels after he was placed in a group home during the first dependency. These numbers remained low for a few months after J.O. was returned to Mother's care, but again spiked to dangerous levels and remained in or near the danger zone for almost six months. After a holiday visit with the foster family, J.O.'s hemoglobin A1c level had dropped four points to 8%, the top of the range Dr. Dajani recommended for patients. Over the next five months of 2012, after J.O. again began living with Mother, his level again began to rise, approaching a dangerous level after Mother failed to take him to see the doctor for a period of nine months. Then, while J.O. lived with the foster family for the first eight months of 2013, the foster family reported J.O.'s blood sugar measurements to the doctor weekly, and those levels remained in the safe range. Just 11 days after returning to Mother's care, however, J.O.'s blood sugar measurement was again high, bordering on uncontrolled.

**¶24**		This pattern supports the court's findings that J.O.'s blood sugar measurements, although under control while J.O. stayed with the foster family, would rise—to potentially fatal levels on multiple occasions—while J.O. lived with Mother. Although Mother testified that J.O.'s blood sugar measurements had consistently decreased while in her care and had not again reached dangerous levels, J.O.'s medical records show the contrary, and we defer to the court's assessment of conflicting facts. *See Jesus M.*, 203 Ariz. at 280, 282, ¶¶ 4, 12, 53 P.3d at 205, 207. The superior court was in the best position to assess Mother's alternative explanation—that J.O. was undermining her management of his diabetes out of anger and a desire to live with the foster family—as contrasted with

the medical evidence and the doctor's and the case manager's opinions that J.O. was not manipulating the system. *See id.*

¶25 Mother also argues the superior court erred by terminating her parental rights because DCS failed to offer appropriate reunification services. She specifically claims DCS should have offered her additional diabetes education and training as well as joint counseling with J.O. to rebuild their relationship. As DCS points out, however, the statutory provision authorizing severance based on neglect does not expressly include reunification services as an element. *Compare* A.R.S. § 8-533(B)(2), *with* A.R.S. § 8-533(B)(8), (11) (expressly requiring proof DCS made "a diligent effort to provide appropriate reunification services" before severance on different grounds). Nor has our case law interpreted the neglect ground to require proof of reunification services. In fact, during closing statements at the severance hearing, Mother's counsel conceded that the availability of reunification services was relevant only to the dependency finding, not to severance:

> . . . [DCS] is just focusing on their severance petition with respect to grounds of abuse, therefore there would be no need to discuss the issue of services. But actually, services are very relevant when we're looking at the issue of dependency in this case.

¶26 Moreover, even assuming that Mother did not waive this argument and that reunification services were required before severance, the superior court did not err. The record reflects that Mother received ample education regarding J.O.'s medical needs at each of his appointments with Dr. Dajani as well as during the 2010–11 dependency, and Mother herself testified that she knew how to monitor, manage, and treat diabetes.

¶27 Furthermore, the joint counseling Mother suggests as a necessary reunification service would have only tangentially related to the ground of medical neglect underlying the severance. Although Mother testified that J.O. was thwarting his own diabetes care out of anger at her, the superior court's findings implicitly rejected Mother's theory, and we defer to that court's reasonable resolution of evidentiary conflicts. *See Jesus M.*, 203 Ariz. at 282, ¶ 12, 53 P.3d at 207. Without a link between Mother's personal relationship with J.O. and Mother's care for his diabetes, interpersonal counseling would not have addressed the reason for the dependency or the severance. Accordingly, the superior court did not err even absent an offer of services such as counseling or additional education. *See James H. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 1, 2, ¶ 8, 106 P.3d 327, 328

(App. 2005) (stating that possible constitutional obligation to provide reunification services, even absent statutory duty, requires only potentially effectual, not futile, efforts).

## CONCLUSION

**¶28** For the foregoing reasons, we affirm the superior court's order terminating Mother's parental rights.



Ruth A. Willingham · Clerk of the Court
FILED : gsh